**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| STAR EV Corporation,<br>*Plaintiff,*<br><br>v.<br><br>UNITED STATES; U.S. CUSTOMS AND BORDER PROTECTION; and ERIC CHOY, in his official capacity as Executive Director, Trade Remedy Law Enforcement Directorate, Office of Trade, U.S. Customs and Border Protection,<br><br>*Defendants.* | Court No. 1:26-cv-3645 |

**COMPLAINT**

**Introduction**

1. The Constitution governs the Executive Branch, including its agencies like U.S. Customs and Border Protection.

2. This Court has confirmed that the due-process clause of the Fifth Amendment to the Constitution requires that U.S. Customs and Border Protection ("Customs") provide an importer "a meaningful opportunity" to be heard *before* Customs imposes interim measures in an investigation brought under the Enforce and Protect Act[1] - "not afterwards." *Superior Com. Sols., LLC v. United States*, 811 F. Supp. 3d 1363, 1376–77 (Ct. Int'l Trade 2025) (agreeing with plaintiff challenging EAPA interim measures that "a meaningful opportunity to respond should happen before a temporary deprivation takes effect, not afterwards"); *see also Icon EV LLC v. United States*, 1:26-cv-02759, 2026 WL 1122468 *5 (Ct. Int'l Trade, April 24, 2026) (finding ICON would likely succeed on the merits of due process claim because it "'likely has a legitimate property

[1] Title IV, Section 421, of the Trade Facilitation and Trade Enforcement Act of 2015 is commonly referred to as the Enforce and Protect Act (hereinafter, "EAPA").

interest in the proper assessment of imports for which it did not receive due process before interim measures were imposed'") (citing *Superior*, 811 F. Supp. 3d at 1376)

3. Rather than follow this Court's judgment and the Constitution, Customs ignored both by informing Plaintiff STAR EV Corporation ("STAR EV") of the investigation on the same day it imposed interim measures. Accordingly, STAR EV received no notice or meaningful opportunity to be heard prior to the imposition of interim measures.

4. Had Customs afforded STAR EV the process it was due, STAR EV could have easily pointed out the material, factual inaccuracies in the Allegation, and otherwise demonstrated to Customs that its imported merchandise covered by the interim measures is not subject to the antidumping or countervailing duty orders ("Orders") of the U.S. Department of Commerce ("Commerce"), dated August 12, 2025, that govern low-speed personal transportation vehicles ("LSPTVs").

5. The particular interim measures that Customs imposed here - likened by this Court to "sanctions," *Phoenix Metal Co. v. United States*, 2024 WL 2891503, at *9 (Ct. Int'l Trade June 10, 2024) (citing *Ford Motor Co. v. United States*, 44 F. Supp. 3d 1330, 1339 n.16 (Ct. Int'l Trade 2015)) will imminently and irremediably harm STAR EV.

6. Unless this Court enjoins the interim measures, Customs' unconstitutional actions will effectively escape judicial review, emboldening Customs to continue violating importers' due-process rights.

## **The Parties**

7. STAR EV is a U.S.-based importer of record and ultimate consignee of imported merchandise, headquartered in Simpsonville, South Carolina.

8. Defendant the United States of America is amenable to service through the Attorney-in-Charge, International Trade Field Office, Commercial Litigation Branch, Department

of Justice. *See* USCIT Rule 4(h).

9. Defendant U.S. Customs and Border Protection is a federal agency headquartered in the District of Columbia with its principal office located at 1300 Pennsylvania Avenue, N.W., Washington, D.C. Customs is an agency within the Department of Homeland Security. Among other duties, Customs enforces EAPA, including by imposing interim measures.

10. Defendant Eric Choy, sued solely in his official capacity, is Executive Director of the Trade Remedy Law Enforcement Directorate (hereinafter, "Customs") at Customs' Office of Trade. In that capacity, Executive Director Choy has the ultimate responsibility for the actions of Customs, including the imposition of interim measures under EAPA. Executive Director Choy maintains an office at 1331 Pennsylvania Avenue, N.W., Washington, D.C.

**Jurisdiction**

11. The Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1581(i)(1)(D).

12. Section 1581(i)(1)(D) confers on this Court "exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for … administration and enforcement with respect to the matters referred to in … subsections (a)–(h) of this section," which includes actions commenced under section 517 of the Tariff Act of 1930.

13. This civil action challenges a United States agency's administration and enforcement of matters pursuant to Section 517 of the Tariff Act of 1930. Specifically, this action challenges Customs' imposition of interim measures under 19 U.S.C. § 1517(e).

14. Typically, 28 U.S.C. § 1581(i) "shall not confer jurisdiction over an antidumping or countervailing duty determination which is reviewable . . . by the Court of International Trade under section 516A(a) of the Tariff Act of 1930." However, courts have made clear that jurisdiction under

28 U.S.C. § 1581(i) is available when "jurisdiction under another subsection of 1581 is either unavailable or, if available, 'manifestly inadequate.'" *NEC Corp. v. United States*, 151 F.3d 1361, 1368 (Fed. Cir. 1998) (citing *Shakeproof Indus. Prod. Div. v. United States,* 104 F.3d 1309, 1312 (Fed.Cir.1997); *Miller & Co. v. United States,* 824 F.2d 961, 963 (Fed.Cir.1987)).

15. Here, jurisdiction under 28 U.S.C. § 1581(c) is manifestly inadequate because the "grave economic harm" that STAR EV faces cannot be remedied through this Court's review of a final evasion determination. *Hylsa v. United States*, 22 C.I.T. 44, 48 (1998).

16. STAR EV will suffer irreparable, fatal harm if the unlawfully imposed interim measures are not immediately enjoined. Because of the imminent harm, any remedy pursuant to section 1581(c) will be manifestly unjust because the irreparable economic harm will have already occurred, depriving STAR EV of its ability to challenge - and this Court the ability to review - any adverse final determination of evasion. *See Scripps-Howard Radio, Inc. v. FCC,* 316 U.S. 4, 10 (1942) ("If the administrative agency has committed errors of law for the correction of which the legislature has provided appropriate resort to the courts, such judicial review would be an idle ceremony if the situation were irreparably changed before the correction could be made."). Without immediate removal of the interim measures, STAR EV will most certainly not be in business long enough to enjoy the refund of duties collected under these interim measures in the event of a favorable final determination that there was no evasion.

17. Congress anticipated that 28 U.S.C. § 1581(c) would not be the exclusive means for obtaining judicial review of unlawful actions that Customs takes in EAPA investigations. 19 U.S.C. § 1517(g)(3) ("Nothing in this subsection shall affect the availability of judicial review to an interested party under any other provision of law."). Section 1581(i) is the "only adequate avenue available" for importers to "adjudicate an issue that goes to the very heart of the administrative system." *NEC Corp. v. United States*, 151 F.3d 1361, 1369 (Fed. Cir. 1998). More

plainly, Section 1581(i) is the only avenue for importers to effectively raise due process claims with respect to unlawfully imposed interim measures. Unless this Court exercises jurisdiction, Customs will have the power to bankrupt importers through unlawful interim measures and effectively insulate its decisions in EAPA investigations from judicial correction. Customs' decision to impose the particular interim measures that it imposed here, without notice or an opportunity to be heard, constitutes reviewable final agency action within the meaning of 5 U.S.C. § 704. *See* 28 U.S.C. § 2640(e); *Bennet v. Spear*, 520 U.S. 154 (1997).

18. In *Icon EV*, this Court recently held that the plaintiff, ICON, by showing "a real possibility of bankruptcy within the month" if the Court did not offer relief from the interim measures - the same interim measures imposed upon STAR EV here - it would "likely not be able to obtain an adequate remedy for the alleged due process violation if it must wait for this court's review under (c) jurisdiction." *Icon EV*, 2026 WL 1122468 at *4. More specifically, the Court held,

> [T]here are no procedures that ICON can use to challenge Customs' imposition of interim measures with no notice. ICON should not be driven to extinction while waiting for judicial review of a final determination when the interim measures—not the final determination—have caused its injury. Thus [Section 1581](i) jurisdiction is appropriate.

*Id.*

19. The dire financial situation of STAR EV presents the same compelling argument for this court's intervention. Due to the interim measures, STAR EV has been unable to ship the inventory currently waiting in Vietnam. Because this inventory must travel to STAR EV via shipping container, the process from initiating shipment to customer delivery takes approximately three months. Not only does this holding pattern prevent STAR EV from generating revenue, but STAR EV is also incurring the continued cost to store that merchandise. Additionally, STAR EV has a container in a bonded warehouse that contains critical components in short supply. Removal of the interim measures would allow that container to enter the United States in a couple of days, providing

immediate revenue as the additional merchandise travels via shipping container. However, unless the interim measures are removed in the next month, enabling STAR EV to initiate this process of generating any revenue, it faces imminent bankruptcy. STAR EV is party to a seventh forbearance agreement with its primary lender, the terms of which will not be extended beyond September 15, 2026, as long as the interim measures are in place. Similarly, the interim measures have directly impacted STAR EV's ability to secure alternative financing. The accelerated balance of that indebtedness, coupled with STAR EV's inability to obtain alternative financing and generate revenue through new inventory, will bankrupt the company by the end of September. Further, although STAR EV has succeeded in its request to Customs to toll duty assessments pending an EAPA response to the STAR EV request to remove the interim measures, that tolling period will almost certainly expire without any EAPA response.

20. Here, as in *Icon EV*, without notice, there are no procedures STAR EV can use to challenge Customs' improper presumptions with respect to antidumping and countervailing duty orders, which spurred its imposition of interim measures. Thus, this Court's exercise of jurisdiction under 28 U.S.C. § 1581(i)(1)(D) is equally appropriate.

## Background

### A. STAR EV's History in the LSPTV Space

21. STAR EV is a 23-year-old manufacturer of unique, compliant, safe and fun low speed vehicles that employs around 96 South Carolinians in Simpsonville, South Carolina. In addition, a national network of about 150 dealers offers STAR EV's merchandise for sale to U.S. customers.

22. STAR EV has been importing LSPTV parts from around the world to domestically manufacture consumer-driven, state-of-the-art electric golf carts ("STAR EV's merchandise" or "merchandise") in South Carolina since 2003. STAR EV focuses on building electric mobility

products for personal transportation, resorts, campuses, industrial facilities, and commercial fleet use. STAR EV provides a customer centric approach that has helped it become one of the most innovative designers and manufacturers of electric personal transport vehicles in the global market. Recently, STAR EV started to import Vietnamese LSPTVs from Vietnam.

**B. <u>The August 2025 LSPTV Orders</u>**

23. STAR EV was an active participant in the antidumping and countervailing duty investigations of Commerce and the International Trade Commission that culminated in final scope language, and antidumping and countervailing duty orders. *Certain Low-Speed Personal Transportation Vehicles From the People's Republic of China: Amended Final Antidumping Duty Determination and Antidumping Duty Order; Amended Final Determination of Countervailing Duty Investigation and Countervailing Duty Order*, 90 Fed. Reg. 38,759 (Dep't Com. Aug. 12, 2025) (hereinafter, "Orders").

24. The Orders cover finished LSPTVs of Chinese origin, as well as certain unfinished or unassembled LSPTVs of Chinese origin, defined by the scope as follows:

> An unfinished and/or unassembled LSPTV subject to these orders covers at a minimum a subassembly, also known as a "rolling chassis," which is typically comprised of, but not limited to, a frame or body with front and/or rear suspension components (such as arms, springs, axles, spindles, and shafts) installed and powertrain components (including either an electric motor or a gas-powered internal combustion engine) installed or ready for installation.
>
> When imported together with a rolling chassis subject to these orders, other LSPTV components, such as batteries, bumpers, wheel and tire assemblies, cowlings, fenders, grills, kick plates, steering column and steering wheel assemblies, dash assembly, seat assemblies, pedal assemblies, brake assemblies, canopy or roof assemblies, temporary rain enclosures, windshields, mirrors, headlights, taillights, lighting systems, or storage—whether assembled or unassembled, whether as part of a kit or not, and whether or not accompanied by additional components—constitute part of an unfinished and/or unassembled LSPTV that is subject to these orders. The inclusion of other products, components, or assemblies not described here does not remove the product from the scope….
>
> LSPTVs and subassemblies subject to these orders include those that are produced in the subject country whether assembled with other components in the subject

> country or in a third country. Processing or completion of finished and unfinished LSPTVs and subassemblies either in the subject country or in a third country does not remove the product from the scope.

Orders, at 38,763.

25. According to the scope of the Orders, subject merchandise must be either a finished Chinese LSPTV, or an unfinished LSPTV that must contain at least a Chinese-origin "subassembly, also known as a 'rolling chassis,' which is typically comprised of, but not limited to, a frame … with front and/or rear suspension components … installed and powertrain components … installed or ready for installation." Orders, at 38,763. Certain parts, when imported with a rolling chassis, are also subject to the Orders. *See* Orders, at 38,763.

26. Further, certain items are categorically exempted from the Orders if they are not on the same bills of lading as Chinese-origin subassemblies/rolling chassis (provided they are accompanied by an appropriate certification): including seat-assemblies, steering columns, suspension systems, plastic cowlings, and electric and gas-powered motors suitable for use in LSPTVs. *See* Orders, at 38,763.

27. Since the imposition of duties during the underlying antidumping and countervailing duty investigations conducted prior to the issuance of the Orders, STAR EV has consistently and transparently worked with Customs to demonstrate compliance with the requirements of the Orders.

## C. <u>The March 13, 2026 Allegations by Star EV's Competitors</u>

28. On March 13, 2026, Wiley Rein, LLP, on behalf of STAR EV's direct competitors, the American Personal Transportation Vehicle Manufacturers Coalition[2] ("Coalition"), submitted its "Low Speed Personal Transportation Vehicles from the People's Republic of China: Request for Investigation under the Enforce and Protect Act" (the "Allegation") to Customs.

---

[2] The individual members of the Coalition are Club Car, LLC and Textron Specialized Vehicles, Inc.

29. The Allegation states the Coalition "has reason to believe that" STAR EV "has evaded the AD and CVD orders on LSPTVs from China[.]"

30. The Allegation consists of materially misleading and inaccurate information provided by the Coalition, for the purpose of seeking unfair commercial advantage against STAR EV.

31. Such misleading and inaccurate information within the Allegation includes:

- The suggestion that "STAR EV began changing importing patterns," when in fact STAR EV invested in new equipment, and an entirely new configuration model which included adding an additional production line in South Carolina, as well as hiring and training of additional personnel to ensure that STAR EV never needs to import an LSPTV or subassembly/rolling chassis from China;
- The false allegations that STAR EV used HTS codes 9506.32, 9506.39 and 8716.80 to import LSPTV parts, thereby evading the Orders when in fact the Automated Commercial Environment ("ACE") filings of STAR EV show that it has not imported LSPTV parts using these HTS codes, or – as preposterously claimed by the Coalition – HTS codes for umbrellas, golf balls, artificial joints and medical instruments and appliances. These false allegations are ostensibly based on bill of lading data, despite the fact that STAR EV suppliers do not include HTS codes on their bills of lading;
- The false allegation that STAR EV uses HTS 8716.80 when it imports tires for LSPTVs, when in fact ACE filings for STAR EV show that is not the case;
- The false allegation that STAR EV is not a "manufacturer", which was only supported by a single Facebook photograph, when STAR EV has publicly provided photographs and other documentation of STAR EV's manufacturing capabilities

during the AD/CVD investigations, and invited the USITC to visit STAR EV's facility during the AD/CV investigation;

- The false allegation that STAR EV's 220,000 sq. ft. South Carolina facility cannot support the manufacture of LSPTVs;
- The false allegation that Minland "is not a legitimate LSPTV producer" of LSPTVs with Vietnam as the county of origin, given that such allegation lacked any supporting data or evidence.
- The false allegation that the STAR EV facility does not have the technical capabilities needed to manufacture LSPTV subassemblies on site, implying that because the zoning classification of STAR EV's facilities is "industrial light" that STAR EV could not possibly have technical capabilities to manufacture LSPTV subassemblies when the facility of one of the two Coalition members has the same industrial classification;
- The false allegation that "there is no indication of manufacturing equipment or infrastructure for manufacturing LSPTVs or LSPTV subassemblies" at STAR EV's facility;
- The false allegation, without any supporting data, that STAR EV is transshipping golf carts through Vietnam;
- The false allegation that STAR EV imported subject LSPTV rolling chassis' from EDA and Windus, based off information from EDA and Windus's respective websites, rather than evidence from ACE which clearly identify the products STAR EV has imported from those respective companies – STAR EV patented plastic combo seats, coolers and other plastic components.

32. On March 20, 2026, Customs imitated its investigation against STAR EV based on

the Allegation and put an internal memorandum on file formalizing this initiation date.

**D. The April 10, 2026 Notice of Investigation and Imposition of Interim Measures**

33. STAR EV did not receive notice of Customs' investigation until April 10, 2026.

34. Customs, reciting the claims of the Allegation and referencing almost no additional diligence on its part, notified STAR EV that Customs "shall implement the following interim measures":

- Suspend the liquidation of each unliquidated entry of such covered merchandise that entered on or after March 20, 2026, the date of initiation of the investigation;
- Extend liquidation of unliquidated entries that entered before the date of initiation of the investigation, March 20, 2026;
- Require "live" entry for all imports of LSPTV from China and Vietnam by the Importers, requiring the Importers to submit proper documentation and all duties prior to release of the merchandise;
- The AD/CVD rates are the "all others" rate [(*i.e.*, 519.23 percent *ad valorem* (478.09 percent AD plus 41.14 percent CVD))] on LSPTV and parts, if the U.S. Department of Commerce has not determined a separate rate that would apply to that entry.

*Id*.

35. The interim measures effectively require STAR EV to immediately pay Customs over 500% rate of duty on STAR EV's prior imports from the POI, resulting in millions of dollars of unexpected costs related to prior imports during the period identified. As above, although STAR EV was successful in tolling this process for three prior shipments, that tolling period has evidently expired.

36. These measures were imposed *before* STAR EV had knowledge of the basis for

Customs' suspicion of evasion or of the basis for the Allegation that prompted Customs' determination. STAR EV received no notice, from Customs or otherwise, that an EAPA allegation had been received by Customs, that Customs had commenced an EAPA investigation, or that Customs was contemplating imposing interim measures. STAR EV had no reason to believe that Customs had received an EAPA allegation, that an EAPA investigation was underway, or that Customs was contemplating imposing interim measures covering any entries.

37. Had STAR EV been informed that Customs had received the Allegation, that an EAPA investigation was underway, or that Customs was contemplating imposing interim measures, it would have (1) easily identified the myriad of defects and improper presumptions in the Allegation, and (2) provided comprehensive, exhaustive documentation showing that STAR EV does not import Chinese-origin LSPTVs or rolling chassis, and that the only LSPTVs that STAR EV imports are products of Vietnam.

38. Had STAR EV been informed that Customs had received the Allegation, that an EAPA investigation was underway, or that Customs was contemplating imposing interim measures, it could have stopped imports of its merchandise until resolution and avoided potentially incurring many millions of dollars in AD/CVD duties.

**E. <u>Star EV's May 22, 2026 Letter to Customs</u>**

39. STAR EV was not afforded a meaningful opportunity to respond before Customs imposed interim measures. The notice of initiation was based on highly misleading and inaccurate information provided by the Coalition seeking unfair commercial advantage against STAR EV through the EAPA process.

40. In a letter to Customs on May 22, 2026, counsel for STAR EV pointed Customs to multiple inconsistencies in the Allegation. Counsel for STAR EV indicated that Customs could and should have checked the import records of STAR EV – immediately available in its possession

in the ACE portal – to verify the claims of the Coalition. Surely, Customs should have easily dispensed with allegations such as STAR EV importing Chinese LSPTV parts under the HTSUS code for golf balls, 9506.32. In so doing, Customs could and should have evaluated the Allegation to determine its reliability, credibility and probative value – and if it had, it would have found the Allegation wanting on all accounts.

41. Critically, the Orders do *not* cover STAR EV's merchandise. However, because Customs imposed interim measures on the same date that it alerted STAR EV of the investigation, STAR EV was not able to share any of its import practices or documents with Customs before imposition of the interim measures. As set forth in the STAR EV Letter, given an opportunity, STAR EV would have been able to show Customs that:

- STAR EV does not import any Chinese-origin rolling chassis.
- STAR EV's importation of Chinese LSPTV parts are neither imported with a Chinese rolling chassis, nor will those parts be combined with a Chinese rolling chassis to make an LSPTV.
- STAR EV's Chinese-origin merchandise does not "at a minimum" contain a Chinese-origin rolling chassis, as the Orders require.
- The LSPTVs that STAR EV imports from Vietnam are Vietnamese-origin vehicles, accompanied by a Vietnamese Government certification of origin on a shipment-by-shipment basis, and are not Chinese-origin.
- STAR EV possesses a plethora of information, including facility videos and component-specific manufacturing data from the facility in Vietnam; highly probative data that STAR EV was not able to share with Customs prior to the imposition of the interim measures.
- Suppliers EDA and Windus do not provide any chassis, rolling chassis, or frames to STAR EV.

42. Had STAR EV been afforded the opportunity to be heard, it could have informed Customs of the above multitude of errors in the Allegation, alerting Customs that the Allegation was materially defective. However, Customs chose instead to simply parrot substantial portions of the Allegation in the Notice.

43. STAR EV is committed to working with Customs throughout the EAPA investigation to demonstrate its full compliance with the Orders.

**F. <u>The Coalition's June 5, 2026 Response to the STAR EV Letter</u>**

44. On June 5, 2026, the Coalition, through Wiley Rain, LLP, submitted its "Response to STAR EV Request to Remove Interim Measures." In the Coalition Response, the Coalition incorrectly states that STAR EV failed to submit any factual information rebutting the record that initially led Customs to impose interim measures. However, as set forth above, the STAR EV Letter pointed Customs to multiple inconsistencies in the Allegation, along with evidence immediately available in Customs' possession which would disprove statements in the Allegation.

45. The Coalition Response failed to address any of the errors in the Allegation raised in the STAR EV Letter.

46. As of the date of this Complaint, Customs has not responded, in full or in part, to the Request to Remove Interim Measures requested in the STAR EV Letter.

**G. <u>Consequences of the Interim Measures</u>**

47. The interim measures that Customs imposed will, if not enjoined by this Court and imminently bankrupt STAR EV.

48. STAR EV is incapable of repaying its primary lender in full when the loan forbearance sunsets on September 15, 2026, due to the interim measures. Cutting expenses, passing costs on to dealers or customers, or moving production elsewhere do not come close to bridging this multi-million dollar chasm.

49. The interim measures were imposed while STAR EV had merchandise on its way to the United States. Such merchandise – which was intended to fulfill active customer orders – currently resides in a bonded warehouse, causing STAR EV lost revenue and the risk of customer order cancellations. However, due to the interim measures STAR EV cannot retrieve that container

full of critical components in short supply, which would enter the United States in a matter of days and generate immediate revenue for STAR EV.

50. STAR EV has merchandise in China, Vietnam, and other countries subject to firm customer orders. Such merchandise cannot be shipped while interim measures are in place, as STAR EV would be forced to pay an additional $6,207,537.44 due to the 519.23% AD/CVD rate. Because this inventory must travel to STAR EV via shipping container, the process from initiating shipment to customer delivery takes approximately three months. Not only does this holding pattern prevent STAR EV from generating revenue, but STAR EV is also incurring the continued cost to store that merchandise.

51. Because STAR EV lacks stock of requested merchandise – merchandise which is either trapped overseas or in a bonded warehouse as a result of the interim measures – STAR EV has been forced to offer its limited existing inventory to accommodate customer orders. STAR EV is accommodating customers by providing more expensive merchandise and absorbing the extra cost to retain business.

52. STAR EV is also facing significant delays to its current orders as it is unable to obtain necessary parts from China, Vietnam, and elsewhere.

53. Further, the interim measures have directly impacted STAR EV's ability to secure alternative financing and continue operations.

54. The interim measures have already caused, and will continue to cause, STAR EV to lose goodwill, business opportunities, reputation, and sales losses.

## COUNT I

### Customs Violated STAR EV's Fifth Amendment Right to Due Process by Failing to Provide STAR EV Notice and a Meaningful Opportunity to be Heard

55. STAR EV incorporates paragraphs 1 through 54 by reference.

56. The Fifth Amendment to the U.S. Constitution provides, among other things, that

no person shall "be deprived of life, liberty, or property, without due process of law."

57. The due-process clause of the Fifth Amendment requires that Customs provide an importer "a meaningful opportunity" to be heard before, not after, Customs imposes interim measures. *Superior Com. Sols.*, 811 F. Supp. 3d at 1376–77.

58. This is plainly what the Fifth Amendment requires under the *Mathews* due-process balancing test, which considers the private interest at stake, the risk of erroneous deprivation, and the public interest. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

59. "[T]he private interest that will be affected by" interim measures is great—although unlawfully imposed monetary exactions can be refunded, STAR EV has no practical ability "to ameliorate the interim loss." *Mathews*, 424 U.S. at 341. Because Customs typically has 300 days to investigate, the imminent harm will be irreparable by the conclusion of the typical process.

60. The risk of erroneous deprivation through the imposition of interim measures in EAPA investigations is high; Customs applies a reasonable-suspicion standard based on allegations submitted by interested parties like competitors, rather than a preponderance-of-the-evidence standard based on "unbiased" reports from disinterested parties. *Mathews*, 424 U.S. at 344.

61. The public interest is not impaired by affording importers a mere meaningful opportunity to respond before interim measures are imposed, as opposed to a full-blown evidentiary hearing; it costs the government little to afford importers time to make a documentary submission in response to an EAPA allegation that Customs has already been aware of for perhaps months. *Cf. Mathews*, 424 U.S. at 347–48.

62. Customs failed to provide STAR EV notice and a meaningful opportunity to respond before imposing interim measures because it never apprised STAR EV of the pendency of an EAPA investigation, the existence of an EAPA allegation, the possibility that Customs would

impose the interim measures, or the chance to respond in opposition.

63. STAR EV has "a legitimate property interest in the proper assessment of imports for which it did not receive due process before interim measures were imposed." *Icon EV*, at *5. For STAR EV, "these are not just temporary deviations until the EAPA investigation results in a determination … [t]hey are deprivations of such immediacy and magnitude" that they will cause STAR EV to declare bankruptcy before it can fully contest the determination. *Id*.

64. Because Customs failed to provide STAR EV notice and a meaningful opportunity to respond before imposing interim measures, Customs violated STAR EV's Fifth Amendment right to due process, and the interim measures were unlawfully imposed.

65. Because Customs has improperly imposed interim measures and subsequently evidenced no intention of considering or responding to the STAR EV Letter respectfully requesting the "remov[al] of the interim measures without having to resort to litigation in the U.S. Court of International Trade," Customs has quite simply left STAR EV with no other option to protect its due process rights.

**COUNT II**

**The Reasonable-Suspicion Standard, As Applied Here, Violates the Fifth Amendment**

66. STAR EV incorporates paragraphs 1 through 65 by reference.

67. Based on a "reasonable suspicion" of evasion, Customs imposed interim measures pursuant to 19 U.S.C. § 1517(e)(3) that requires STAR EV to immediately pay Customs many millions of dollars.

68. The reasonable-suspicion standard, as applied in this case, violated STAR EV's Fifth Amendment right to due process by permitting Customs to deprive STAR EV of significant property interests through a low evidentiary standard with a high risk of erroneous deprivation. *Mathews*, 424 U.S. at 335–48 ("The essence of due process is the requirement that a person in jeopardy

of serious loss (be given) notice of the case against him and opportunity to meet it.") (internal citations omitted).

69. Because Customs' application of the reasonable-suspicion standard in this case violated the Fifth Amendment, the interim measures were unlawfully imposed.

**COUNT III**

**Customs Violated 19 U.S.C. § 1517(e)**

70. STAR EV incorporates paragraphs 1 through 68 by reference.

71. Customs must at least have "reasonable suspicion" of evasion to impose interim measures. 19 U.S.C. § 1517(e).

72. Customs' suspicion of evasion on the part of STAR EV was not reasonable.

73. Customs' suspicion of evasion was based on incomplete, misleading, and/or inaccurate information, which Customs knew or should have known was false when imposing the interim measures.

74. By relying on incomplete, misleading, and/or inaccurate information – which should have been easily verifiable through even just a cursory review of STAR EV's ACE filings – Customs conclusions "may well have been premature or mistaken." *Icon Ev*, at *6.

75. Because Customs lacked reasonable suspicion of evasion, the interim measures were unlawfully imposed.

**PRAYER FOR RELIEF**

STAR EV respectfully requests that this Court:

(a) Declare that Customs unlawfully imposed the interim measures;

(b) Enjoin the interim measures;

(c) Award STAR EV its costs and attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

(d) Grant STAR EV such further relief as this Court deems appropriate.

Dated: August 14, 2026

Respectfully submitted,

*/s/ David J. Garrett*
David J. Garrett
Christian Dysart (Admission Pending)
*dgarrett@maynardnexsen.com*
*cdysart@maynardnexsen.com*
MAYNARD NEXSEN PC
4141 Parklake Avenue, Suite 200
Raleigh, NC 27612
P: 919.755.1800
*Counsel for STAR EV Corporation*