**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: JANE A. RESTANI, TIMOTHY C. STANCEU, AND LEO M. GORDON, JUDGES**

| | |
|---|---|
| STAR EV Corporation,<br>*Plaintiff,*<br><br>v.<br><br>UNITED STATES; U.S. CUSTOMS AND BORDER PROTECTION; and ERIC CHOY, in his official capacity as Executive Director, Trade Remedy Law Enforcement Directorate, Office of Trade, U.S. Customs and Border Protection,<br><br>*Defendants.* | Case No. 26-3645 |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**
**AND JUDGMENT ON THE AGENCY RECORD**

Christian Dysart
MAYNARD NEXSEN PC
4141 Parklake Avenue, Suite 200
Raleigh, NC 27612
919.755.1800
cdysart@maynardnexsen.com

Dated: November 24, 2026

# TABLE OF CONTENTS

INTRODUCTION ........................................ 1

RULE 56.1 STATEMENT ........................................ 2

BACKGROUND ........................................ 3

I. The Department of Commerce Issued Antidumping and Countervailing Duty Orders on LSPTVs Covering, at a Minimum, Chinese-Origin Rolling Chassis Consisting of a Frame With Suspension and Powertrain Components ........................................ 3

II. Customs Initiated its Investigation Based on the Coalition's Allegation, which was Riddled with Inaccuracies and Misstatements and Failed to Engage in a Thorough Investigation ........................................ 3

III. Customs Provided Notice of the EAPA Investigation and at the Same Time Imposed the Interim Measures ........................................ 11

SUMMARY OF ARGUMENT ........................................ 11

ARGUMENT ........................................ 13

I. Standard of Review ........................................ 13

II. Customs Failed to Provide STAR EV Pre-deprivation Notice or Any Opportunity to be Heard, in Violation of the Fifth Amendment ........................................ 13

III. The Reasonable Suspicion Standard Sets an Unconstitutionally Low Bar for the Imposition of the Challenged Interim Measures ........................................ 19

IV. Even if the Reasonable Suspicion Standard Passes Constitutional Muster, As Applied, Customs Lacked the Reasonable Suspicion Necessary to Impose the Challenged Interim Measures ........................................ 25

V. The Court Should Issue Permanent Injunctive and Declaratory Relief ........................................ 30

CONCLUSION ........................................ 32

## TABLE OF AUTHORITIES

**Cases**

*Addington v. Texas*, 441 U.S. 418 (1979) ........................................................................19

*AM/NS Calvert LLC v. United States*, 654 F. Supp. 3d 1324 (Ct. Int'l Trade 2023)....................13

*Butz v. Economou*, 438 U.S. 478 (1978)..........................................................................18

*CEK Grp. LLC v. United States*, 633 F. Supp. 3d 1369 (Ct. Int'l Trade 2023)............................25

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) ...........................................14, 15, 18

*Doran v. Salem Inn, Inc.*, 422 U.S. 922 (1975) ..................................................................16

*Dunaway v. New York*, 442 U.S. 200 (1979).......................................................................20, 21

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006).........................................................31

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC) Inc.*, 528 U.S. 167 (2000) .................31

*ICON EV LLC v. United States*, 836 F. Supp. 3d 1361 (Ct. Int'l Trade 2026)..................... *passim*

*ICON EV LLC v. United States*, Court No. 26-02759, 2026 WL 2295795 (Ct. Int'l Trade Aug. 10, 2026) ..........................................................................................24

*ICON EV LLC v. United States*, Court No. 26-02759 (Ct. Int'l Trade filed Apr. 13, 2026)........................................................................................ *passim*

*JSC Acron v. United States*, 893 F. Supp. 2d 1337 (Ct. Int'l Trade 2013)..................................13

*Mathews v. Eldridge*, 424 U.S. 319 (1976)......................................................................... *passim*

*Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1 (1978) ..................................................15

*Mullane v. Central Hanover Bank & Tr. Co.*, 339 U.S. 306 (1950)............................................14

*Phoenix Metal Co. v. United States*, Court No. 23-00048, 2024 WL 2891503 (Ct. Int'l Trade June 10, 2024)..........................................................................................15

*Royal Brush Mfg., Inc. v. United States*, 75 F.4th 1250 (Fed. Cir. 2023)..............................14, 15

*Santosky v. Kramer*, 455 U.S. 745 (1982) ...........................................................................19, 20

*Steffel v. Thompson*, 415 U.S. 452 (1974) ...........................................................................32

*Superior Com. Sols., LLC v. United States*, 811 F. Supp. 3d 1363 (Ct. Int'l Trade 2025).........................................................................14, 15, 19

*Terry v. Ohio*, 392 U.S. 1 (1968) ...................................................................................20, 21

*Ulstein Maritime, Ltd. v. United States*, 833 F.2d 1052 (1st Cir. 1987).......................................31

*United States v. Brignoni-Ponce*, 422 U.S. 873 (1975) ..............................................................21

*United States v. Place*, 462 U.S. 696 (1983) .......................................................................22, 23

*Vexas Corp. v. United States*, Consol. Court No. 26-03809

(Ct. Int'l Trade filed Aug. 28, 2026)....................14, 18, 22

*Vitek v. Jones*, 445 U.S. 480 (1980)....................20

*Woodby v. Immigration & Naturalization Serv.*, 385 U.S. 276 (1966) ....................19

**Statutes**

5 U.S.C. § 706....................13

19 U.S.C. § 1517(b) ....................4, 16, 23, 24

19 U.S.C. § 1517(c)(1)(A)–(B)....................22

19 U.S.C. § 1517(c)(2)....................4, 16, 27

19 U.S.C. § 1517(e) .................... *passim*

28 U.S.C. § 1581(i)(1)(D)....................13

28 U.S.C. § 2640(e) ....................13

28 U.S.C. § 2643(c)(1)....................30

**Regulations**

19 C.F.R. § 165.15(c)(1) ....................9

19 C.F.R. § 165.24(a)....................26

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: JANE A. RESTANI, TIMOTHY C. STANCEU, AND LEO M. GORDON, JUDGES**

| | |
|---|---|
| STAR EV Corporation,<br>*Plaintiff,*<br><br>v.<br><br>UNITED STATES; U.S. CUSTOMS AND BORDER PROTECTION; and ERIC CHOY, in his official capacity as Executive Director, Trade Remedy Law Enforcement Directorate, Office of Trade, U.S. Customs and Border Protection,<br><br>*Defendants.* | Case No. 26-3645 |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND JUDGMENT ON THE AGENCY RECORD**

The undisputed facts and record evidence demonstrate that U.S. Customs and Border Protection ("Customs") violated STAR EV Corporation's ("STAR EV") Fifth Amendment right to due process and violated the Enforce and Protect Act ("EAPA") itself. Specifically, the scant number of documents contained in the administrative record make clear that Customs afforded STAR EV absolutely no notice or any opportunity to be heard prior to imposing sanction-like interim measures, which subjected STAR EV to immediately being forced to pay antidumping and countervailing duty cash deposits, among other sanctions, on any imports.

Customs claims to have imposed these interim measures based on "reasonable suspicion" of antidumping and countervailing duty evasion. Based on the weight of the imposed interim measures, such an evidentiary standard is simply too low. Yet the record evidence demonstrates that Customs lacked even this low evidentiary standard because its "reasonable suspicion" was based on: (1) irrelevant information pertaining to inapplicable

years; (2) incorrect information that could be verified through reviewing public websites and Customs' own data; (3) inconsistent information, such as pointing to a "suspicious" shipment that Customs agents previously physically inspected and cleared; and (4) impermissible information in the form of an adverse inference directed to STAR EV for the failure of some other unnamed third party's failure to do something. In fact, the record evidence demonstrates that at no point during its "investigation" did customs solicit *any* information from STAR EV and instead summarily concluded its investigation in a mere 21 days. Accordingly, rather than demonstrating that it had "reasonable suspicion" to impose interim measures, the record evidence shows that Customs imposed extreme interim measures without conducting a thorough investigation.

Customs actions and inactions not only deprived STAR EV of its Constitutional right to due process under the Fifth Amendment, but also deprived STAR EV of the minimal protections afforded under the EAPA. For any of these reasons, STAR EV is entitled to judgment. The Court should accordingly enter judgment in STAR EV's favor and issue declaratory and permanent injunctive relief.

**RULE 56.1 STATEMENT**

1. The administrative determination to be reviewed is Customs' April 10, 2026 Notice of Initiation of Investigation and Interim Measures - EAPA Case 8282.

2. Customs denied STAR EV due process by imposing interim measures under 19 U.S.C. §1517(e) without notice or a meaningful opportunity to be heard. Additionally, the reasonable-suspicion standard, as applied, violates Fifth Amendment due process because it sets too low of an evidentiary bar. Finally, Customs lacked reasonable suspicion of evasion sufficient to justify the interim measures, as it misconstrued the antidumping and

countervailing duty orders, relied on baseless competitor conjecture, imposed an impermissible adverse inference, ignored its own records and agent actions, posed no questions to STAR EV, and otherwise undertook no meaningful independent investigation.

3. STAR EV requests an order permanently enjoining the interim measures and declaring that Customs violated the law.

## BACKGROUND

### I. The Department of Commerce Issued Antidumping and Countervailing Duty Orders on LSPTVs Covering, at a Minimum, Chinese-Origin Rolling Chassis Consisting of a Frame With Suspension and Powertrain Components

Plaintiff Star EV relies upon and adopts the background statement with this heading as submitted by plaintiff ICON, *see ICON EV LLC v. United States*, Court No. 26-02759, ECF No. 66 at 3-7, (Ct. Int'l Trade filed Apr. 13, 2026), and incorporates it by reference as accurately stating the history and timeline of the underlying low-speed personal transportation vehicle (LSPTV) investigation initiated by Commerce on July 16, 2024. In the interest of efficiency and judicial economy, it is not duplicated here. For emphasis, it bears repeating that the plain language of the Orders, as previously interpreted by this Court, make clear that parts not combined with a Chinese-origin subassembly are not covered by the LSPTV Orders. Nothing in the country of origin certification requirement alters that result.

### II. Customs Initiated its Investigation Based on the Coalition's Allegation, which was Riddled with Inaccuracies and Misstatements and Failed to Engage in a Thorough Investigation

STAR EV is a South Carolina-based importer of electric golf carts and golf cart parts. *See* ECF No. 36-1 at PV000007, PV00006. While STAR EV originally imported these products primarily from China, *see id.* at PV000007–08, PV000018, in early 2026, it shifted its sourcing to include Vietnamese, and additional US, suppliers, *see id.* at PV000025, PV000093. During the period of investigation, STAR EV imported golf cart parts from China (and other countries), *see*

ECF No. 36-15 at PV000429–30; ECF No. 36-12 at PV000410–12, and in 2026 began importing LSPTVs from Vietnam, *See* ECF No. 36-15 at PV000432; ECF No. 36-1 at PV000093. STAR EV has consistently and openly communicated to Customs from which countries STAR EV imports merchandise, and from which suppliers it imports from. *See* ECF No. 36-15 at PV000429 ("CBP data systems confirm . . . that Star EV reported Chinese manufacturers Marshell, . . . Eagle, . . . Edacar . . . and Windus . . . as sources"); ECF No. 36-10 at PV000381, PV000392 (entry summary and commercial invoice declaring China as country of origin and Marshell as seller).

Under the EAPA, an interested party may submit an allegation that merchandise covered by an AD/CVD order has entered the United States through evasion. 19 U.S.C. § 1517(b)(1). Customs must initiate an investigation within fifteen business days of accepting the petition if the allegation reasonably suggests evasion. *See* ECF No. 36-3 at PV000152; ECF No. 36-1 at PV000009. Although STAR EV contends that the Allegation submitted by the Coalition was riddled with readily apparent inaccuracies, as detailed below, STAR EV understands that the threshold to initiate an investigation is comparatively low.

However, before determining whether to impose interim measures, Customs has ninety calendar days from initiation to investigate and decide whether "there is a reasonable suspicion" of evasion. *See* ECF No. 36-15 at PV000429. Pursuant to 19 U.S.C. § 1517(c)(2), Customs has broad authority to "collect and verify" any information it deems necessary to make its evasion determination. In fact, Customs routinely exercises that authority by issuing forms CF-28s and CF-29s to investigate an alleger's allegations and obtain information directly from the importer. *See, e.g.*, ECF No. 36-15 at PV000433 (describing reliance on importers' CF-28 responses in EAPA Cons. Case 8247).

Here, Customs formally initiated its investigation on March 20, 2026. *See* ECF No. 36-6

at PV000247; ECF No. 36-5 at PV000245; ECF No. 36-7 at PV000253; ECF No. 36-15 at PV000426. Unfortunately, the Coalition's allegation deliberately confused the issue of what constitutes covered merchandise under the Orders. *See* ECF No. 36-1 at PV000003, PV000016–17. Customs, at a minimum, had an obligation to review the actual, precise language of the *LSPTV Orders*, not just the Coalition's interpretation of them. *See id.* at PV000004, PV000006 (scope language). Instead, it cut and pasted the Allegation into its Notice. *Compare* ECF No. 36-6 at PV000248–50, *with* ECF No. 36-15 at PV000426–28.

The administrative record confirms that Customs' initiation memorandum simply restated the Coalition's allegations, and provides no evidence whatsoever that Customs fact checked any of said allegations. *See* ECF No. 36-6 at PV000248–51. The Notice makes 33 "Alleger says" attributions and contains 35 footnotes citing the Allegation. *See* ECF No. 36-15 at PV000425–29. The Notice contains zero of these facts checked by Customs.

One aspect of the Coalition's allegation warrants emphasis. The Coalition alleged that Star EV (and other industry competitors) imported subject merchandise under the Harmonized Tariff Schedule of the United States ("HTSUS") categories for golf balls and golf accessories to avoid paying the required AD/CVD duties. *See* ECF No. 36-1 at PV000003, PV000021–24. It is here that Customs' lack of any meaningful investigation becomes crystal clear. This allegation is false. Completely false. Customs had in its possession prior to imposition of the interim measures, information proving that this allegation was without merit. *See* ECF No. 36-12 at PV000410–12 (CBP trade data for all STAR EV entries, March 17, 2025 – March 17, 2026); ECF No. 36-10 at PV000381–92 (Entry 0215 classified under Chapter 83, 84, 85, 87, 94 subheadings, not 9506). Customs evidently did not deem it necessary to fact check this wild allegation. Customs had a duty to do so. Customs had the absolute ability to do so. Customs failed to do so.

A mere *21 days later*, on April 10, 2026, Customs simultaneously informed STAR EV of the investigation and imposed interim measures. *See* ECF No. 36-15 at PV000424, PV000433–34. During that 21-day period, Customs never issued routine CF-28 or CF-29 forms to STAR EV to investigate the Coalition's allegations. *See generally* ECF Nos. 36-1 to 36-15; ECF No. 36-16 ¶¶ 3–4 (certifying completeness of record). To the contrary, Customs' internal initiation email directed that the investigation "must NOT be disclosed to personnel outside of CBP (such as importers, brokers, counsel, etc.)." ECF No. 36-7 at PV000253. Had STAR EV been informed of the investigation or received these forms, it would have provided comprehensive, exhaustive documentation. That documentation would have shown that STAR EV does not import Chinese-origin LSPTVs or rolling chassis, and that the only LSPTVs or rolling chassis it imports are products of Vietnam. *See* ECF No. 36-10 at PV000392 (STAR EV certification on Entry 0215 invoice that it "does not import Chinese subject unfinished LSPTVs or Chinese subject subassemblies (i.e., rolling chassis)").

In a letter to Customs dated May 26, 2026, counsel for STAR EV pointed Customs to multiple inconsistencies in the Allegation. ECF No. 11 at 11. As counsel pointed out, Customs could and should have checked the import records of STAR EV, which were immediately available in Custom's possession, to verify or disprove the claims of the Coalition. *See* ECF No. 36-12 at PV000410–12. However, by that point, Customs had already imposed interim measures. *See* ECF No. 36-15 at PV000433–34. Further, affording notice and an opportunity to be heard would have allowed STAR EV to correct Custom's misreading of the *LSPTV Orders* and to provide whatever additional information was needed. Because STAR EV was not afforded any opportunity to respond during this "investigatory" period, it was not afforded due process.

The Coalition argues that Customs completed its own independent investigation based on the allegation(s) it made. However, a line-by-line analysis of the independent investigatory findings of TRLED investigators indicates that no meaningful independent investigation occurred between March 20 and April 10, and that any questions the investigators may have had during that period could and should have been easily resolved by using the prescribed CF-28 and CF-29 investigatory process – well within the aforementioned ninety (90) day investigatory period. *See* ECF No. 36-15 at PV000429–33. In particular, within its "Notice of Initiation and Investigation and Interim Measures," dated April 10, 2026, *id.* at PV000424, the totality of the TRLED investigation record indicates that:

(1) TRLED used an adverse inference against STAR EV, here an impermissible adverse inference based on the conduct of others (evidently a CF-28 response failure by one or more unnamed third parties) *See id.* at PV000432–33 (relying on reasonable-suspicion finding in EAPA Cons. Case 8247 "based on the importers' failure to provide Minland's documentation . . . in a Customs Form-28 response").[1];

(2) TRLED pointed to a single "suspicious" Entry Summary ("Entry 0215") as evidence that subject merchandise was part of that entry. *Id.* at PV000431–32; *see* ECF No. 36-10 at PV000379–95. TRLED: (1) properly quotes the Orders regarding "rolling chassis," ECF No. 36-15 at PV000431–32; (2) notes that a "chassis frame" is listed on the Commercial Invoice, *id.; ECF No. 36-10 at PV000393 ("Steel Chassis Frame – J-Model 4/4+2 Frame Assembly")*; and (3) notes that parts imported with a "rolling chassis" are subject to the Orders, ECF No. 36-15 at PV000432. All true. Of course, the unwritten TRLED inference was that the frames met the definition of a

[1] Presumably, this adverse inference was based on information Customs collected in EAPA Consolidated Case 8247, an investigation of other importers. *See* ECF No. 36-15 at PV000433 & nn.77–78. Customs did not consolidate the STAR EV investigation (8282) with EAPA Investigation 8247 until many weeks after imposition of these interim measures.

"rolling chassis," subjecting the merchandise to the Orders. *See id.*. STAR EV does not deny Customs a right to make inferences,  but as shown below, Customs had actual knowledge that these frames did **NOT** meet the definition of a rolling chassis.

Between August 8 and August 22, 2025 Customs inspected (an "intensive exam," per Customs documentation) Entry 0215, of course found no rolling chassis and released the goods without imposing any AD/CVD duties. *see* Pl.'s Resp. & Reply, ECF No. 42 at 19–21.Even under the Coalition's post-*LSPTV Orders* novel and impermissible "disassembly" theory (discussed below), *see* ECF No. 36-1 at PV000003, PV000021, the merchandise in question was determined by Customs as not constituting subject merchandise. *see* Pl.'s Resp. & Reply, ECF No. 42 at 19–21. If Customs had any lingering doubts, it could and should have communicated same to STAR EV as part of the investigatory process. Again, no CF-28 or CF-29 has ever been issued by Customs in connection with this shipment that they inspected yet later deemed "suspicious." *See generally* ECF Nos. 36-1 to 36-15; ECF No. 36-16 ¶¶ 3–4.

(3) TRLED pointed to a single item in a single import transaction (again, Entry 0215 It concluded that STAR EV's use of HTS 8708.99.5300 (a frame made of cast iron, rather than steel) was an error. ECF No. 36-15 at PV000431; ECF No. 36-10 at PV000381. 52 67 On that basis, STAR EV should have paid 57.5% duty on that item instead of the 55% it declared and paid (suggesting, at most, "evasion" of 2.5%). *see* Pl.'s Resp. & Reply, ECF No. 42 at 19–21.Assuming only for these purposes that Customs is correct:

(i) a single error is not evidence of a pattern or practice, and is certainly not indicative of evasion;

(ii) the Harmonized Tariff Schedule of the United States does not have a specific code for LSPTV frames;

(iii) Customs Informed Compliance Publication "Vehicles, Parts and Accessories Under the HTSUS" repeatedly acknowledges that vehicle classification is complicated;

(iv) the entire shipment was clearly and conspicuously labeled "Golf Car Parts," which is both accurate and not evasive; *See* ECF No. 36-10 at PV000392 (invoice: "GOLF CART SPARE PARTS . . . THE CONTENTS OF THIS CONTAINER ARE NOT SUBJECT MERCHANDISE");

(v) the discrepancy was not related to antidumping or countervailing duties; and (6) a single clerical error (amounting to a $451 discrepancy) is not the basis for initiating an investigation pursuant to 19 C.F.R. § 165.15(c)(1) (note that despite this minor error TRLED's checklist states the alleged evasion was *not* a clerical error under 19 U.S.C. § 1517(a)(5)(B), ECF No. 36-5 at PV000245);

(4) TRLED added 3 attachments to the Administrative Record documenting the relationship between Minland and Marshell, which to STAR EV's knowledge has never been a disputed fact. *See* ECF No. 36-11 at PV000397 (Attachments 1–3: corporate structure chart, USPTO trademark registrations, and trade data); ECF No. 36-15 at PV000432.

(5) TRLED uploaded irrelevant Minland and Marshell trade data from its CBP Data Systems for transactions in 2025. *See* ECF No. 36-11 at PV000408 ("Period: June 2025 to November 2025"). In doing so, it ignored its own records (and even the Allegation) that clearly indicate that STAR EV imported no merchandise from Minland during that period. *See* ECF No. 36-1 at PV000025, PV000093 (first STAR EV imports from Minland identified in February 2026); ECF No. 36-12 at PV000412.and

(6) TRLED claimed that four STAR EV suppliers did not generally sell LSPTV parts. ECF No. 36-15 at PV000430–31, PV000433. It uploaded information from the public-facing B2C (business-to-consumer) websites of four Chinese companies, ECF No. 36-8 at PV000256, apparently without making any further effort whatsoever to examine whether any of these businesses also had B2B (business-to-business ODM or OEM) customer relationships. Was Customs on notice that further investigation was required? Absolutely.

The first sentence of the Marshell home page says: "Marshell is one of the most famous manufacturers of electric vehicles and battery-related automotive electronic components in China." *Id.* at PV000259. The heading of the company profile uploaded by Customs indicates that Marshell is a: "Manufacturer/Factory & Trading Company." *id.* at PV000281, and states "ODM Service Available: Yes." *Id.* While not shown in the administrative record, a simple click today on the "Trade Capacity" button on the 'made in China' site referenced by Customs indicates 3,417 Marshell products. The Eagle home page promotes: "Global spare parts network for fast replenishment" and states: "OEM/ODM collaborations are welcome." ECF No. 36-8, Attachment 2. The EDACAR homepage, touting its 15-year history of manufacturing world class golf cart parts and accessories for Coalition members CLUB CAR and E-Z-GO, ECF No. 36-1 at PV000002, states: "EDACAR always has sufficient inventory to ensure customers receive parts and accessories in the fastest time we keep a stock of over 100 pieces for each cart part." And, lastly, the Windus "About Us" page clearly indicates that "Windus prides itself on being a "one-stop supply chain solution." ECF No. 36-8 at PV000333. It also describes Windus as "[a]n OEM/ODM manufacturer. *Id.* Had TRLED investigators conducted a *thorough* investigation on each of these websites, they would at the very least have questioned the relevance of these website printouts to an evasion investigation.

As above, the Administrative Record indicates that the TRLED investigation was not "thorough;" in fact, it appears that, aside from confirming STAR EV suppliers, *see* ECF No. 36-15 at PV000429, and pulling the single Entry 0215, *see* ECF No. 36-10 at PV000379, no meaningful independent investigation occurred at all between March 20 and April 10. *See* ECF Nos. 36-8 to 36-12 (all TRLED memoranda to the file, dated March 25 through April 8, 2026).

### III. Customs Provides Notice of the EAPA Investigation and at the Same Time Imposes the Interim Measures

On April 10, 2026, after a mere 21 days of 'investigation,' Customs provided notice by email of the EAPA investigation against STAR EV. *See* ECF No. 36-15 at PV000424 (Notice addressed to STAR EV at amys@starev.com and tonyc@starev.com) The email further stated that interim measures would be imposed, including extending and suspending liquidation of certain entries. *Id.* at PV000433–34.

Importantly, Customs also decided to impose discretionary interim measures under 19 U.S.C. §1517(e). *Id.* at PV000434. Specifically, Customs required "live entry" for "all imports of LSPTV from China and Vietnam," rejection and refiling of entry summaries that were within the rejection window, and the payment of cash deposits at the "all others" rate "on LSPTV and parts" (a combined rate of over 500 percent *ad valorem*) unless a separate rate applies. *Id.*

As above, STAR EV was not contacted by Customs at any time during its "investigation." *See* ECF No. 36-7 at PV000253; ECF No. 36-16 ¶¶ 3–4. Unlike other cases before the Court where companies under investigation contend that they received no *meaningful* opportunity to be heard, STAR EV received no opportunity to be heard whatsoever.

## SUMMARY OF ARGUMENT

The administrative record confirms that STAR EV received absolutely no pre-deprivation notice or opportunity to be heard. The Court should therefore grant STAR EV judgment on Count

One of the Complaint.

Customs also violated STAR EV's Fifth Amendment due process rights another way: by imposing the interim measures under too low of an evidentiary bar. To impose measures that would put an importer out of business before an evasion determination can be reached, the Constitution requires that Customs apply a more rigorous standard than reasonable suspicion. As exemplified in the facts of this case, the reasonable-suspicion standard invites too high a risk of error, subordinating STAR EV's substantial interests to hasty, underinformed decision-making where no exigency exists to justify it. STAR EV is thus entitled to judgment on Count Two of its complaint.

Finally, beyond these constitutional violations, Customs also violated 19 U.S.C. §1517(e) by imposing the interim measures without reasonable suspicion of evasion. The administrative record shows that Customs' "reasonable suspicion" relied almost exclusively on false allegations by STAR EV's competitors, which Customs did not verify, followed by uploaded scans of largely irrelevant documents. Further, it is shocking that Customs (1) used an adverse inference against STAR EV for the conduct of an unrelated party as its primary argument for 'reasonable suspicion,' and (2) described an entry that it had physically examined and cleared as "suspicious." The record evidence demonstrates that throughout its brief 21-day investigation, Customs failed to solicit *any* information from STAR EV, the entity most equipped to dispel allegations with actual facts. Had STAR EV had the opportunity, it would have provided comprehensive documentation evidencing that it did not evade the *LSPTV Orders*. Therefore, STAR EV is entitled to judgment on Count Three of its complaint.

For any of these reasons, Customs violated the law in imposing the interim measures at issue, and the Court should grant judgment in STAR EV's favor.

## ARGUMENT

### I. Standard of Review

Because this action seeks review of an agency determination under 28 U.S.C. § 1581(i)(1)(D), the Court "shall review the matter as provided in section 706 of title 5." 28 U.S.C. § 2640(e). That section in turn provides "the reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be," among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "contrary to constitutional right[.]" 5 U.S.C. § 706(2).[2]

### II. Customs Failed to Provide STAR EV Pre-deprivation Notice or Any Opportunity to be Heard, in Violation of the Fifth Amendment.

As explained in STAR EV's prior briefing, imposing interim measures (including rejecting entries and requiring live entry with an irrebuttable presumption that the entries are subject to AD/CVD duties) without prior notice or a meaningful opportunity to be heard violates Fifth Amendment due process, both because this Court has already said so and because *Mathews v. Eldridge*, 424 U.S. 319 (1976), leads to the same result. *See ICON EV LLC v. United States*, 836 F. Supp. 3d 1361, 1370 (Ct. Int'l Trade 2026). The record confirms that STAR EV received absolutely no notice, much less an opportunity to be heard before Customs imposed the interim measures. Because Customs violated STAR EV's Fifth Amendment right to due process by failing to provide pre-deprivation notice and any opportunity to be heard, STAR EV is entitled to judgment on Count One of its Complaint.

[2] Although the government argued within its prior briefing that this Court does not have jurisdiction, the government has not sought discovery as to any facts underlying jurisdiction and relief. Rather, as reflected in the Scheduling Order entered on November 20, 2026, the government has agreed to expedite briefing regarding the merits of the case. ECF No. 63. Nevertheless, to the extent necessary, STAR EV also moves for summary judgment in connection with these facts, which fall outside the scope of record review. *AM/NS Calvert LLC v. United States*, 654 F. Supp. 3d 1324, 1339 n.13 (Ct. Int'l Trade 2023); *JSC Acron v. United States*, 893 F. Supp. 2d 1337, 1344 n.7 (Ct. Int'l Trade 2013).

The facts alone make clear that Customs provided STAR EV with absolutely zero notice or opportunity to be heard before the interim measures were imposed. Customs routinely issues forms CF-28 and CF-29 to investigate the alleger's allegations prior to imposing interim measures. Evidencing the routine nature of form CF-28 in this investigative process, on information and belief, all of the other consolidated Plaintiffs in this action appear to have received a form CF-28 prior to the imposition of the interim measures. *See, e.g., ICON EV LLC v. United States*, Court No. 26-02759, ECF No. 66 at 22 (Ct. Int'l Trade filed Apr. 13, 2026); *Vexas Corp. v. United States*, Consol. Court No. 26-03809, ECF No. 7, Ex. 4 (CF-28 Response) (Ct. Int'l Trade filed Aug. 28, 2026). Yet Customs did not issue a CF-28 request for information from STAR EV prior to imposing interim measures. The record is clear that Customs had absolutely no pre-deprivation communication with STAR EV prior to initiating the interim measures. Accordingly, the government does not and cannot dispute that STAR EV was afforded no notice or opportunity to be heard before the interim measures were imposed. *Mullane v. Central Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) (notice must "apprise interested parties of the pendency of the action and afford them an opportunity to present their objections").

The law further supports that Customs violated STAR EV's Fifth Amendment right to due process. This Court already found when granting ICON preliminary injunctive relief that the Fifth Amendment affords "an importer participating in an administrative proceeding," including an EAPA proceeding, the procedural due process right to notice and a meaningful opportunity to be heard." *ICON EV*, 836 F. Supp. 3d at 1370-71 (quoting *Superior Com. Sols., LLC v. United States*, 811 F. Supp. 3d 1363, 1376 (Ct. Int'l Trade 2025); *Royal Brush Mfg., Inc. v. United States*, 75 F.4th 1250, 1257 (Fed. Cir. 2023)). Due process generally requires the government to provide such notice and a meaningful opportunity to be heard before, not after, a deprivation occurs. *Cleveland*

*Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (stating, after summarizing case law, that "some form of pretermination hearing" is generally required).

"To determine whether due process has been provided, courts consider (1) the private interest at stake: (2) the risk of an erroneous deprivation through the procedures used and the probative value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *ICON EV*, 836 F. Supp. 3d at 1370 (citing *Mathews*, 424 U.S. at 335). Consistent with the Court's reasoning in ICON, the Fifth Amendment required Customs to provide STAR EV notice and a meaningful opportunity to be heard before imposing interim measures.

*First*, regarding the private interest at stake, this Court has already made clear that an importer has "a legitimate property interest in the proper assessment of imports for which it did not receive due process before interim measures were imposed." *ICON EV*, 836 F. Supp. at 1370-71 (citing *Superior Com. Sols.*, 811 F. Supp. 3d at 1370-71 (citing *Royal Brush Mfg.*, 75 F.4th at 1257))). Given the effect of the interim measures on STAR EV, this property interest is heightened. Here, the interim measures suddenly imposed a combined 519.23% *ad valorem* cash-deposit rate. "The combination of cash deposits for AD/CVD duties with the live entry requirement"—akin to "sanctions"—"requires the importer to suddenly deposit a large amount of cash with [Customs] before it can even complete the sale for which it is importing the goods." *Phoenix Metal Co. v. United States*, Court No. 23-00048, 2024 WL 2891503, at *9 (Ct. Int'l Trade June 10, 2024) (citation omitted). The imposition of these measures "for any appreciable time works a uniquely final deprivation." *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 20 (1978). And although duties may later be refunded, STAR EV lacks any realistic ability "to ameliorate the interim loss,"

*Mathews*, 424 U.S. at 341, because it would likely be put out of business before any claim for refund could even be made. *See, e.g., Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975) (stating that a "favorable final judgment might well be useless" for a company facing imminent bankruptcy).

*Second,* the high risk of erroneous deprivation necessitates notice and a meaningful opportunity to be heard. The administrative record provides a clear example of not just a high risk, but the probability of erroneous deprivation without notice and a meaningful opportunity to be heard.

Before imposing interim measures, Customs has ninety calendar days from initiation to investigate and decide whether "there is a reasonable suspicion" of evasion. Pursuant to 19 U.S.C. § 1517(c)(2), Customs has broad authority to "collect and verify" any information it deems necessary to make its evasion determination. Because allegations are often raised by highly-motivated competitors in the marketplace, the process of collecting and verifying information is key to ensure further proceedings are not imposed based on erroneous and baseless allegations. Accordingly, Customs routinely issues forms CF-28 and CF-29 to investigate the alleger's allegations and obtain information directly from the importer, the entity with the most readily available information to dispute the allegations.

Here, Customs formally initiated its investigation against STAR EV on March 20, 2026. *See* ECF No. 36-6 at PV000246 (Initiation Memo, dated March 20, 2026); ECF No. 36-5 at PV000245 ("On March 20, 2026, TRLED initiated this investigation, per 19 USC 1517(b)(1)."); ECF No. 36-15 at PV000426. A mere *21 days later*, on April 10, 2025, Customs simultaneously informed STAR EV of the investigation and imposed interim measures.ECF No. 36-15 at PV000424 (Notice of Initiation of Investigation and Interim Measures, dated April 10, 2026,

addressed to Star EV); *id.* at PV000432–33 ("CBP is imposing interim measures pursuant to this investigation."). At no point during that 21-day period did Customs issue its routine forms CF-28 and CF-29 to investigate the alleger's allegations or otherwise obtain information directly from STAR EV or even communicate with STAR EV. The administrative record makes clear that STAR EV had absolutely zero opportunity to provide any information to Customs prior to the initiation of interim measures.

Had STAR EV been informed of the investigation or received requests for information, it would have provided comprehensive, exhaustive documentation directly contradicting the allegations. Specifically, STAR EV would have provided documentation showing that it does not import Chinese-origin LSPTVs or rolling chassis, and that the only LSPTVs or rolling chassis that STAR EV imports are products of Vietnam.

For example, as counsel for STAR EV pointed out to Customs via its May 26, 2026 letter after interim measures were imposed, there were multiple inconsistencies in the allegations. ECF No.11 at 11. With proper notice, STAR EV could have requested Customs to check the import records of STAR EV, which were immediately available in Customs' possession, to verify or disprove the claims of the Coalition. Further, affording notice and an opportunity to be heard would have allowed STAR EV to correct Customs' misreading of the *LSPTV Orders* and to provide whatever additional information was needed. Any questions the investigators may have had during the investigatory period could and should have been easily resolved by using the prescribed CF-28 and CF-29 investigatory process. But because STAR EV was not afforded any notice or opportunity to respond in this "investigatory" period, it had no opportunity to dispel inaccuracies or argue that Customs should tailor its remedy to the "strength or weakness of [its] suspicion." *ICON EV*, 836 F. Supp. 3d at 1374. As shown by the administrative record, such an opportunity

to alert Customs "to the existence of disputes about facts and arguments" that inform Customs' discretion could "substantially reduce[]" the "risk of error." *Loudermill*, 470 U.S. at 543 n.8 (quotation omitted).

*Third*, the public interest supports requiring notice and an opportunity to be heard before imposing the interim measures. *See Mathews*, 424 U.S. at 347-48. As mentioned above, Customs has ninety calendar days from initiation to investigate and decide whether "there is a reasonable suspicion" of evasion. During the comment period of the proposed EAPA rules, multiple commenters voiced concern that the lengthy investigation period "could impede an importer's due process rights by significantly limiting the time to prepare a defense." *Investigation of Claims of Evasion of Antidumping and Countervailing Duties*, 89 Fed. Reg. 19239 (2024), https://www.federalregister.gov/documents/2024/03/18/2024-04713/investigation-of-claims-of-evasion-of-antidumping-and-countervailing-duties#page=19262. However, in response, Customs stated that it needed "adequate time to investigate the alleged evader's actions." *Id.* And although Customs "may make a decision earlier than 90 days" it should only "do so after a **thorough** investigation." *Id.* (emphasis added). Because STAR EV had no notice or opportunity to be heard, there was no opportunity to ensure that Customs investigation was thorough or object to the fact that a 21-day investigatory period was insufficient to conduct a thorough investigation. The government has not suggested that providing such an opportunity to importers before interim measures are imposed would cause any fiscal or administrative burdens. Nor should it make this argument because providing notice and an opportunity to be heard may well lighten the government's burden by "enhanc[ing] the reliability of information and the impartiality of the decisionmaking process," leading to "a less pressing need for individual suits to correct constitutional error." *Butz v. Economou*, 438 U.S. 478, 512 (1978); *see, e.g.*, *Vexas Corp. v. United*

*States,* Consol. Court No. 26-03809 (Ct. Int'l Trade filed Aug. 28, 2026); *ICON EV LLC v. United States*, Court No. 26-02759 (Ct. Int'l Trade filed Apr. 13, 2026).

Therefore, the *Mathews* factors, as well as this Court's prior decisions, *see ICON EV*, 836 F. Supp. 3d at 1370-71; *Superior Com. Sols.*, 811 F. Supp. 3d at 1376-77, demonstrate that Customs violated STAR EV's Fifth Amendment due process rights by depriving it of property before providing notice and an opportunity to be heard. The Court should therefore grant judgment in STAR EV's favor on Count One of its complaint.

### III. The Reasonable-Suspicion Standard Sets an Unconstitutionally Low Bar for the Imposition of the Challenged Interim Measures

Additionally, Customs violated STAR EV's Fifth Amendment right to due process by imposing the interim measures at issue under too low of an evidentiary standard. To impose measures that would put an importer out of business before an evasion determination can be reached, the Constitution requires that Customs apply a more rigorous standard than reasonable suspicion.

"The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *Addington v. Texas*, 441 U.S. 418, 423 (1979) (quotation and citation omitted). The more "severe" and "irreversible" the deprivation, the higher the government's burden of proof. *Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982).

What evidentiary burden should be required for a particular proceeding "is the kind of question which has traditionally been left to the judiciary to resolve." *Woodby v. Immigration and Naturalization Service*, 385 U.S. 276, 284 (1966). And although 19 U.S.C. § 1517(e) specifies a reasonable-suspicion standard of proof, this is immaterial. The "minimum requirements" of Fifth

Amendment due process "are not diminished by the fact that" Congress specified "procedures that it may deem adequate for determining the preconditions to adverse official action." *Vitek v. Jones*, 445 U.S. 480, 491 (1980). The statute "neither removes" STAR EV's "interest from due process protection nor answers the question of what process is due under the Constitution." *Id.*

By comparing the interim measures imposed in this case to the deprivation of a *Terry* stop, *Terry v. Ohio*, 392 U.S. 1 (1968), the government argues that "reasonable suspicion" does not require that law enforcement provide notice or an opportunity to be heard before it may act. ECF 38 at 26. But the sanction-like interim measures imposed here and the brief deprivation allowed pursuant to a *Terry* stop are incommensurate. Applying the *Mathews* factors, "reasonable suspicion" is simply too low of an evidentiary standard to protect STAR EV's private interest at stake and carries too great of a risk of erroneous deprivation. Further, the court's rationale in *Terry v. Ohio* and its progeny make clear that even when the government has great interest in protecting itself or the public, that interest does not allow for a reasonable suspicion standard except in very narrow circumstances.

Both STAR EV's private interest at stake and risk of erroneous deprivation are significant. "The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be condemned to suffer grievous loss." *Santosky*, 455 U.S. at 758 (quotation and citation omitted). Utilizing the government's comparison to criminal law, generally, "whenever practicable," the government must "obtain advance judicial approval" of personal deprivations like "searches and seizures through the warrant procedure," which requires a showing of probable cause. *Terry*, 392 U.S. at 20. Courts continually uphold this "familiar threshold standard of probable cause" to ensure that citizens' Constitutional guarantees cannot be compromised based on "common rumor or report, suspicion, or even 'strong reason to suspect.'"

*Dunaway v. New York*, 442 U.S. 200, 213 (1979). The judiciary only varies from the probable cause standard in narrow exceptions. *Id.* at 213-214. The reasonable-suspicion evidentiary standard allowed pursuant to *Terry* is indeed a very narrow exception.

Pursuant to *Terry*, an officer may stop an individual and briefly conduct a "reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual." *Terry*, 392 U.S. at 27 ("And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the *facts* in light of his experience." (emphasis added)). However, the Court only approved "this narrowly defined less intrusive seizure on grounds less rigorous than probable cause" for the limited purpose of pat-down for weapons. *Dunaway*, 442 U.S. at 210.

Further progeny upholds the extremely limited scope of what an officer can do based upon reasonable suspicion alone. For example, an officer may "question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, *but any further detention or search must be based on consent or probable cause.*" *Dunaway*, 442 U.S. at 212 (citing *U.S. v. Brignoni-Ponce*, 422 U.S. 873, 881-82 (1975)) (emphasis in original). Courts have allowed such limited actions based upon reasonable suspicion in situations that are such "narrow intrusions" that they fall "far short of the kind of intrusion associated with an arrest." *Dunaway*, 442 U.S. at 212. Sanctions-like interim measures that have the effect of ending businesses are simply not comparable to brief stops or invasions of privacy interests that limit the deprivation to a matter of minutes.

Although the government argues that interim measures are "time limited and fully reimbursable," ECF 38 at , there can be no dispute that the duration of interim measures are far

more extensive than a *Terry* stop. Pursuant to the statute, interim measures last throughout the investigative process, which can extend for 360 days, or, as in this case, more. *See* 19 U.S.C. § 1517(c)(1)(A)-(B). Further, the sanctions-like nature of the antidumping and countervailing duties can cause companies to: (1) completely halt their business to avoid accruing sanction; or (2) draw down capital at an exponential rate to pay the duties in hopes of continued operations. Either scenario has a compounding effect on businesses under investigation. As seen with the consolidated plaintiffs and their filing of temporary restraining orders, sanctions-like interim measures have the realistic effect of leading businesses to bankruptcy before Customs has concluded its potentially year-long investigation. *See, e.g., ICON EV LLC v. United States*, Court No. 26-02759 (Ct. Int'l Trade filed Apr. 13, 2026); *Vexas Corp. v. United States*, Consol. Court No. 26-03809 (Ct. Int'l Trade filed Aug. 28, 2026). Refunding duties will not undo bankruptcy or fix the fact that masses of U.S. employees will be left without gainful employment. Accordingly, allowing Customs to impose interim measures that have a realistic effect of a uniquely final deprivation based on mere reasonable suspicion is simply too great of a risk of erroneous deprivation for U.S. companies and their U.S. employees. The standard simply must be higher, here, adopting the Government's comparison to criminal law, probable cause should be required.

Additionally, although the government has an interest in protecting the revenue and enforcing antidumping and countervailing duty orders, those interests do not necessitate immediately putting an importer out of business based on suspicion. Each of the exceptions to the probable cause requirements established through "*Terry* and its progeny rests on a balancing of . . . the nature and quality of the intrusion on the individual's [Constitutional] interests against the importance of the governmental interest alleged to justify the intrusion." *United States v. Place*, 462 U.S. 696, 703 (1983). For example, in *Place* the Court held that an officer was allowed to

make "brief investigative stops of persons at airports on reasonable suspicion of drug-trafficking" to protect the government's interest in "prevent[ing] the flow of narcotics into distribution channels." *Id.* at 704. However, the court recognized that "seizures of property can vary in intrusiveness," so the "brevity of the invasion of the individual's [Constitutional] interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion." *Id.* at 704, 709.

The government has raised similar concerns as in *Place*. Specifically, the government claims that providing due process to importers would allow importers "to obscure the evidence and change their practices before [Customs] has a chance to impose interim measures, thwarting [Customs''] investigative efforts and depriving the government of the revenue." ECF No. 38 at 36. But unlike in *Place*, the government has not narrowly tailored its actions to protect this public interest. The imposed interim measures are not "so minimally intrusive as to be justifiable on reasonable suspicion." *Place*, 462 U.S. at 709. Based on mere reasonable suspicion, the government can impose sanction-like interim measures for essentially an entire year while it conducts an investigation. As exemplified by the litany of plaintiffs who have filed actions related solely to allegations within the LSPTV sector, such a deprivation is not an isolated risk but is an extensively intrusive probability that will continually affect importers in the same position. Accordingly, Customs' ability to impose interim measures warrants a higher standard.

Moreover, the risk of erroneous deprivation based on a reasonable-suspicion standard is high. *Mathews*, 424 U.S. at 335. Highly interested partes, such as competitors, may submit allegations that initiate the investigation. The standard for Customs initiating an investigation is low: it only requires that the allegations "reasonably suggest[]" evasion. 19 U.S.C. § 1517(b). Based on the language within the statute the standard for the imposition of interim measures under

section 1517(e) appears to be different from the standard under section 1517(b). However, the statute itself does not describe what constitutes reasonable suspicion; it is unclear how these two standards differ. *ICON EV LLC v. United States*, Court No. 26-02759, 2026 WL 2295795, at *5 n.9 (Ct. Int'l Trade Aug. 10, 2026). Thus, under Customs' "reasonable suspicion" standard, Customs can initiate an EAPA investigation and mistakenly put a company out of business, without any opportunity for correction, based largely on the uninformed word of a competitor. In contrast, an evidentiary standard that requires findings of evasion *probable*, rather than merely *reasonably suspicious*, would in turn require Customs to fairly balance both sides' evidence before deciding to impose interim measures requiring the immediate payment of potentially many millions of dollars.

Although the government consistently points to the fact that the statutory process affords importers the opportunity to be heard following the investigation, any post-deprivation hearing is meaningless if that company no longer exists to use the process. As this Court pointed out in ICON, "Customs has discretion not to impose all interim measures. The strength or weakness of the suspicion likely should affect that decision." *ICON EV*, 836 F. Supp. 3d at 1374 (internal citation omitted). Because these interim measures would effect a final deprivation, Fifth Amendment due process requires a higher evidentiary standard. Should this court rely on the government's analogy to criminal law as the basis for the evidentiary standard, probable cause should be required before imposing interim measures.[3] Accordingly, STAR EV is entitled to judgment on Count Two of its complaint.

---

[3] In its Motion for Summary Judgment and Judgment on the Agency Record, ICON argued that in the agency context, the preponderance of the evidence standard should govern. *ICON EV LLC v. United States*, Court No. 26-02759, ECF No. 66 at 32-36 (Ct. Int'l Trade filed Apr. 13, 2026). STAR EV is not necessarily arguing that this court should adopt the probable cause standard over the preponderance of the evidence standard. The purpose of STAR EV's briefing on probable cause standard ties to the government's statement that the "reasonable suspicion standard" is borrowed from the criminal law context. But whether this court adopts a preponderance of the evidence standard or the criminal law

## IV. Even if the Reasonable Suspicion Standard Passed Constitutional Muster, As Applied, Customs Lacked the Reasonable Suspicion Necessary to Impose the Challenged Interim Measures

Finally, the record reveals that Customs lacked the reasonable suspicion of evasion necessary to impose the challenged interim measures. What makes suspicion "reasonable" is necessarily context-dependent. As this Court has explained, and as further discussed throughout this motion, the "Supreme Court has long held that the reasonable suspicion needed to initiate investigations, some of which are invasive enough as to violate the Fourth Amendment, varies from statute to statute." *CEK Grp. LLC v. United States*, 633 F. Supp. 3d 1369, 1374 n.1 (Ct. Int'l Trade 2023) (collecting cases). Thus, even if Fifth Amendment due process does not require Customs to use a standard higher than reasonable suspicion to impose the business-ending interim measures at issue—and it does—the reasonable-suspicion standard must still take context into account.

For example, suspecting evasion based on the mere fact that an importer has entered merchandise that would have been subject to an antidumping or countervailing duty order had it been made elsewhere, or based on a competitor's circumvention hypothesis, cannot be reasonable. Nor can imposing interim measures on imported merchandise that is not subject to an antidumping or countervailing duty order. But more apparent here, suspecting evasion based on an insufficient investigation cannot be reasonable.

Although the scope of the *LSPTV Orders* is important, this Court need not delve too far into the scope because the reasonable-suspicion determination falls apart when looking merely at the context of the investigation. The administrative record confirms that Customs' "reasonable

---

equivalent probable cause standard, the foundation of Plaintiffs' arguments are the same: reasonable suspicion is simply too low of an evidentiary standard.

suspicion" is based solely on the Coalition's patently untrue allegations, which Customs did not thoroughly investigate.

Here, the Coalition made three main allegations: (1) STAR EV is importing subject rolling chassis directly from China in a slightly disassembled form, and without paying the necessary AD/CVD duties; (2) STAR EV is importing subject merchandise under HTSUS categories for golf balls and golf accessories, and without paying the required AD/CVD duties; and (3) STAR EV is importing Chinese-origin LSPTVs that have been transshipped through Vietnam in order to evade AD/CVD duties on the subject merchandise. *See* ECF No. 36-15 at PV000426–28; ECF No. 36-1 (Allegation) at 6, 18–25. Customs had ninety calendar days from initiation to investigate and decide whether "there is a reasonable suspicion" of evasion. 19 U.S.C. § 1517(e); 19 C.F.R. § 165.24(a); *see also* ECF No. 36-15 at PV000428. Although Customs itself acknowledged that ninety days was necessary to provide "adequate time to investigate the alleged evader's actions," *Investigation of Claims of Evasion of Antidumping and Countervailing Duties*, 89 Fed. Reg. 19239 (2024), https://www.federalregister.gov/documents/2024/03/18/2024-04713/investigation-of-claims-of-evasion-of-antidumping-and-countervailing-duties#page=19262, its investigation of the Coalition's allegations against STAR EV lasted a mere 21-days. Although such allegations lead to potentially business-ending consequences, Customs did not conduct an investigation for even one-third of the purposefully allocated investigatory period. On information and belief, all of the other consolidated plaintiffs were awarded a full 90-day investigatory period. *See, e.g., ICON EV LLC v. United States*, Court No. 26-02759, ECF No. 66 at 16-18 (Ct. Int'l Trade filed Apr. 13, 2026).

Further, the administrative record makes clear that Customs' investigation during this 21-day period was not thorough. Again, unlike the other consolidated plaintiffs, Customs issued **zero** CF-28 Notices to STAR EV during its "investigation." At no point during its entire investigation

did Customs solicit any information from STAR EV, the entity directly accused and most readily available to defend against inaccurate allegations. In sum, Customs failed to use its statutorily provided broad authority to “collect and verify” the allegations made by the Coalition during its investigation and prior to imposing interim measures. 19 U.S.C. § 1517(c)(2).

Although STAR EV could and would have provided information had Customs made such a request, it is clear that Customs made no effort to conduct its own verification. The Coalition’s second allegation regarding incorrect HTSUS categories is where Customs’ lack of any meaningful investigation becomes readily apparent. *See* ECF No. 36-15 at PV000427–28; ECF No. 36-1 (Allegation) at 18–19, 21.Customs had in its possession prior to imposition of the interim measures, information proving that this allegation was without merit. The Automated Commercial Environment (“ACE”) filings of STAR EV show that it has not imported LSPTV parts using these HTSUS codes. Customs had the ability to verify, or in this case discredit, the allegations on its own. Yet the Notice of interim measures still relied on this same patently false allegation. ECF No. 36-15 at PV000427–28, PV000433. At PV000427–28, the Notice adopts the Coalition's argument that the "shift in classification of Star EV's imports is a strategy to avoid duties". At PV000433, it finds reasonable suspicion based in part on "misclassifying imports of golf cart parts from China".

A line-by-line analysis of the independent investigatory findings of TRLED investigators continues to indicate that no meaningful investigation occurred between March 20 and April 10. For ease of this Court, the following provides three of the most clear-cut examples of the lack of thorough investigation:

(1) TRLED relied on what amounts to an adverse inference against STAR EV – an impermissible adverse inference - based on the conduct of others (evidently some CF-28 response failure by one or more third party importers), ECF No. 36-15 at PV000432–33;[4]

(2) TRLED pointed to a single Entry Summary ("0215") as evidence that subject merchandise was part of that entry. ECF No. 36-15 at PV000430–31, PV000433; *see also* ECF No. 36-10 (Entry 0215 Documentation Memo). But Customs had actual knowledge that these frames did **NOT** meet the definition of a rolling chassis. Between August 8 and August 22, 2025 Customs inspected (an "intensive exam," per Customs information) Entry 0215, of course found no rolling chassis, and released the goods without imposing any AD/CVD duties. Even under the Coalition's novel and impermissible "disassembly" theory, Customs already determined the merchandise in question did not constitute subject merchandise; and

(3) TRLED uploaded irrelevant Minland and Marshell trade data from its CBP Data Systems for transactions in 2025, ignoring its own records (and even the Allegation) that clearly indicate that STAR EV imported no merchandise from Minland during that period. See ECF No. 36-11 at PV000397, PV000408; ECF No. 36-15 at PV000427–28, PV000431–32. Customs had sole and exclusive evidence in its possession that STAR EV did not import anything from Vietnam in 2025, yet failed to fact check the Coalition during its "investigation." The Coalition's own evidence placed STAR EV's first Minland import in February 2026. *See* ECF No. 36-15 at PV000427–28.

[4] This adverse inference is perhaps the most patently egregious basis for "reasonable suspicion." In the hearings before this Court on October 6, 2026, the government contended in oral argument that such an adverse inference was permissible as STAR EV's EAPA proceedings were ultimately consolidated with that of ICON. Yet, as STAR EV's counsel made clear to the Court, this consolidation occurred after the Notice of Initiation and Investigation and Interim Measures. Accordingly, this adverse inference for the conduct of a third party, which was used as Customs' principal argument for "reasonable suspicion" is simply impermissible.

The duration and shallow "investigation" alone make clear that, Customs did not have reasonable suspicion of evasion. Additionally, Customs lacked reasonable suspicion of evasion because of its misconstruction of the *LSPTV Orders*.

Customs misconstrued the *LSPTV Orders'* scope in its Notice. As this Court explained, the *LSPTV Orders* "have a precise and limited scope." *ICON EV*, 836 F. Supp. 3d at 1366. They cover certain Chinese-origin LSPTVs and "subassemblies thereof, whether finished or unfinished and whether assembled or unassembled." *Id.* (quoting *LSPTV Orders*, at 38,763). "An unfinished and/or unassembled LSPTV 'covers at a minimum a subassembly, also known as a 'rolling chassis,' which is typically comprised of, but not limited to, a frame or body' with installed suspension components and installed or installation-ready powertrain components." *Id.* "The *LSPTV Orders* distinguish between Chinese-origin parts that are imported on the same bill of lading as a Chinese-origin rolling chassis—which are covered—and Chinese-origin parts that are imported on separate bills of lading—which are not covered," *id.*, so long as they are not assembled post-importation with Chinese-origin rolling chassis. Put simply, "the *LSPTV Orders* quite clearly state that a rolling chassis, at a minimum, consists of a frame *with* suspension and powertrain components." *Id.* at 1371. Thus, the critical question is whether the imported items included, or were assembled with post-entry, a Chinese subassembly.

Yet in its Notice, Customs states that "the scope of the *[LSPTV] Orders* defines golf cart parts and rolling chassis imported together as subject to the *[LSPTV] Orders.*" ECF No. 36-15 at PV000431. Had Customs issued a form CF-28, STAR EV would have provided comprehensive, exhaustive documentation clarifying that it does not import merchandise covered by the actual scope of the *LSPTV Orders*. *See* ECF No. 11 at 11–13; ECF No. 11-3 at 5–6, 10–12, 14–15. Specifically, STAR EV would have provided documentation clarifying that: (1) it does not import

Chinese-origin LSPTVs or rolling chassis; (2) STAR EV's importation of Chinese LSPTV parts are neither imported with a Chinese rolling chassis, nor will those parts be combined with a Chinese rolling chassis to make an LSPTV; and (3) the only LSPTVs or rolling chassis that STAR EV imports are products of Vietnam, which are accompanied by a Vietnamese Government certification of origin on a shipment-by-shipment basis. STAR EV possess a plethora of information, including facility videos and component-specific manufacturing data from the facility in Vietnam, which is highly probative data. But the administrative record does not contain this information. Indeed, Customs sought absolutely no information directly from STAR EV prior to initiating interim measures.

In sum, Customs lacked reasonable suspicion of evasion in part due to its misconstruction of the *LSPTV Orders*, but in large part due to its lack of conducting a thorough investigation. Because Customs lacked such reasonable suspicion, the interim measures are unlawful. Accordingly, STAR EV is entitled to judgment on Count Three of its complaint.

## V. The Court Should Issue Permanent Injunctive and Declaratory Relief.

To remedy Customs' violations of law, the Court should permanently enjoin Customs from enforcing the interim measures during the pendency of the EAPA investigation and declare that Customs violated the law in imposing the interim measures. This Court has the authority to order any form of relief "that is appropriate in a civil action, including, but not limited to declaratory judgments, orders of remand, injunctions, and writs of mandamus and prohibition." 28 U.S.C. § 2643(c)(1).

First the Court should issue permanent injunctive relief prohibiting Customs from enforcing the interim measures. The Court may issue a permanent injunction where a plaintiff has

demonstrated "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). For much the same reasons that this Court found preliminary injunctive relief was warranted in *ICON*, a permanent injunction is warranted as to STAR EV. STAR will suffer irreparable harm absent injunctive relief, which cannot be remedied through later money damages. *See* Pl.'s Rule 56.3 Statement; *ICON EV*, 836 F. Supp. 3d at 1372-73. And the balance of equities and public interest favor STAR EV, especially given that the limited scope of the injunction that STAR EV seeks and the important constitutional interests that the injunction would vindicate. *See id.* at 1373-74. Accordingly, a permanent injunction is the appropriate remedy for Customs' violations of law in imposing the challenged interim measures.

*Second*, the Court should issue a declaratory judgment, declaring that Customs violated the law when imposing the interim measures. A "declaratory judgment is a milder remedy which is frequently available in situations where an injunction is unavailable or inappropriate." *Ulstein Maritime, Ltd. v. United States*, 833 F.2d 1052, 1055 (1st Cir. 1987). Here, there remains a live dispute between the parties. Although Customs has temporarily agreed to defer collection of AD/CVD duties, *see* Compl. ¶ 19, ECF No. 2, that forbearance is time-limited and revocable, and the interim measures themselves (including suspension of liquidation, live entry, and entry rejection) remain in force. *See* ECF No. 36-15 at PV000433–34. A defendant's voluntary, temporary cessation of challenged conduct does not moot a case. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). Moreover, even if the EAPA investigation concludes by the time the Court enters its judgment, declaratory relief would still be

warranted to vindicate constitutional rights, *see Steffel v. Thompson*, 415 U.S. 452, 466 (1974) ("Congress plainly intended declaratory relief . . . to be utilized to test the constitutionality of state criminal statutes in cases where injunctive relief would be unavailable[.]"), and at least as to Count Three, a resolution of which could impact further proceedings and the parties' rights.

**CONCLUSION**

For these, reasons, the Court should grant STAR EV's motion for summary judgment and judgment on the agency record, permanently enjoin Customs from enforcing those interim measures imposed under 19 U.S.C. § 1517(e) against STAR EV, and declare that Customs' imposition of these interim measures was unlawful.

Dated: November 24, 2026

Respectfully submitted,

*/s/ Christian Dysart*

Christian Dysart
*cdysart@maynardnexsen.com*
MAYNARD NEXSEN PC
4141 Parklake Avenue, Suite 200
Raleigh, NC 27612
P: 919.755.1800

*Counsel for STAR EV Corporation*

**CERTIFICATE OF COMPLIANCE**

I certify that the foregoing submission complies with the word-limitation set forth in Standard Chambers Procedure 2(B)(1) and contains 9,667 words.

Dated: November 24, 2026

*/s/ Christian Dysart*
Christian Dysart
*cdysart@maynardnexsen.com*
MAYNARD NEXSEN PC
4141 Parklake Avenue, Suite 200
Raleigh, NC 27612
P: 919.755.1800
*Counsel for STAR EV Corporation*